**In the Matter of the ESTATE OF Pierre F. GOODRICH, Deceased.**

**INDIANA DEPARTMENT OF STATE REVENUE, INHERITANCE TAX DIVISION, Appellant (Petitioner Below),**

v.

**ESTATE of Pierre F. GOODRICH, Appellee (Respondent Below).**

**No. 2–1280A411.**

Court of Appeals of Indiana, Fourth District.

Sept. 16, 1982.

**1156**

Linley E. Pearson, Atty. Gen., Alembert W. Brayton, Deputy Atty. Gen., Indianapolis, for appellant.

Alvin E. Meyer, Stephen J. Peters, Stewart, Irwin, Gilliom, Fuller & Meyer, Claude M. Warren, Warren, Snider & Warren, Indianapolis, for appellee.

MILLER, Judge.

Pierre F. Goodrich died on October 25, 1973, leaving the majority of his vast estate to three existing private foundations he had previously established—Liberty Fund, Inc., (established 1960); Thirty-Five Twenty, Inc., (established 1965); and The Winchester Foundation (established 1945). The Indiana Department of State Revenue (Revenue) petitioned the probate court for an assessment of inheritance taxes, approximating $3,500,000, against these transfers. The co-executors of Goodrich's estate (Estate) contended the transfers were exempt from such taxation by reason of statutory provisions, since repealed,[1] in effect at Goodrich's death. The Estate alleged the transfers were entitled to exemption under

---

1. IC 6–4–1–3 (Burns 1972) was repealed by Acts 1976, P.L. 18, § 2. The current inheritance tax exemption statutes are found at Ind. Code 6–4.1–3–1 to –12 (1976, Burns Supp. 1982).

the language of Ind.Code 6–4–1–3 (Burns 1972) because all three foundations were organized under the laws of this state for charitable or educational purposes (principally educational) and because each had "past practices" of expending "more than a merely nominal part" of its "income" for such purposes within Indiana.

The probate court, after a hearing on the evidence, held all three foundations qualified for the exemption under the statute. Revenue is appealing claiming, primarily, the past practices of the foundations clearly indicate only a nominal part of their income was used in Indiana.

We affirm the exemptions for Liberty Fund and The Winchester Foundation and remand to the probate court for an assessment against Thirty-Five Twenty.

## FACTS

Pierre F. Goodrich died possessed of a net estate worth $24,694,386, of which $19,471,-044 devolved to the three foundations: $19,-077,256 to Liberty Fund; $368,083 to Thirty-Five Twenty; and $25,705 to The Winchester Foundation. Liberty Fund and Thirty-Five Twenty were both incorporated as not-for-profit corporations in accordance with the 1921 Indiana Foundation Act (now governed by the Indiana Not-For-Profit Corporation Act). Both were organized to promote educational purposes, the most specific concern being human liberty. These two foundations are also income tax-exempt under the Internal Revenue Code (I.R.C. § 501(c)) as educational organizations. The Winchester Foundation is a private trust with its principal office in Indiana and is also classified as a charitable, educational or religious organization by the Internal Revenue Service (under I.R.C. § 501(c)).

For purposes of the instant litigation, an accounting firm prepared work sheets and a summary of financial information for each foundation, specifically categorizing expenditures made in Indiana. This data was introduced at the hearing by Revenue as evidence of the past practices of each foundation with respect to the amounts spent in certain years in this state for educational or charitable purposes.

For the years 1963 through 1978 (1966 through 1978 for Thirty-Five Twenty), Revenue's exhibits reveal, in addition to the total yearly income, amounts expended in Indiana for gifts, contributions, grants, education and research, categories which Revenue at oral argument acknowledged could have been considered by the trial court in determining whether expenditures in Indiana were merely nominal.

*Liberty Fund, Inc.*

From 1963 through 1973, the year in which Goodrich died, the Liberty Fund expended $116,449 in Indiana for gifts, contributions and research, ten percent of a total income of $1,131,569. The fund spent from two to 46% of its income on an annual basis in this time period. For the period after Goodrich's death, 1974 through 1978, the Fund expended $252,936 for such purposes. This was approximately four percent of the income of $6,836,727.

*The Winchester Foundation*

The Winchester Foundation, from 1963 through 1973, spent $733,264 in Indiana for gifts and contributions, an amount which greatly exceeded the total income for that period of $255,378. Even excluding a sizable donation to the Liberty Fund in 1963 ($652,998), the remaining expenditures in Indiana were over 30% of the total income. From 1974 through 1978, The Winchester Foundation spent 29% of its income on gifts and contributions in Indiana ($65,302 of an income of $266,080).

*Thirty-Five Twenty, Inc.*

From 1966 through 1973, this foundation expended in Indiana a net amount of $500, made in 1966, as against income of $127,660 (less than one-half of one percent). After Goodrich died, and through 1978, the corporation spent $7,500 for gifts and contributions from an income of $206,745, approximately 4%. Thirty-Five Twenty was totally inactive in Indiana except for 1966, 1976, and 1978.

## DECISION

Essential to the decision in this cause is the Indiana inheritance tax exemption statute as it existed in 1973 when Goodrich died. Ind.Code 6–4–1–3 (Burns 1972) stated in pertinent part:

"... there shall be exempt from the tax imposed by this act [6–4–1–1—6–4–1–40] ... (d) all transfers to any corporation, institution, society, association, or trust, wherever incorporated or organized, formed for *charitable, educational, or religious purposes:* Provided, That ... in the case of transfers under subdivision (d) to corporations, institutions, societies, associations or trusts incorporated or organized under the laws of the state of Indiana the exemption shall be granted only if *more than a merely nominal part of the property transferred or of the income therefrom is to be used,* either according to the provisions of the will or other instrument of the transfer or *according to the past practices of the donee or donees, for one or more of such purposes within the state of Indiana,* and only if, as respects that part of the property transferred or the income therefrom which is not to be used for one or more of such purposes within the state of Indiana, the use or uses which are to be made of a material share of such property or such income, either according to said provisions or according to said past practices, are for the benefit of mankind generally and not for the exclusive benefit of a particular locality outside the state of Indiana; but in all cases under subdivisions (a), (b), (c), and (d) no such transfer shall be exempt if any officer, member, shareholder or employee of such corporation, institution, society, association or trust shall receive or may be lawfully entitled to receive any pecuniary profit from the operation thereof, except reasonable compensation for services in ef-fecting one or more of such purposes, or as proper beneficiaries of a strictly charitable purpose, or if the organization of any such corporation, institution, society, association, or trust for any of the foregoing avowed purposes be a guise or a pretense for directly or indirectly making it, or for any of its officers, members, shareholders or employees any other pecuniary profit, or if it be not in good faith organized or conducted for one or more of such purposes; ...."[2] (Emphasis added.) I.C. 6–4–1–3.

I.C. 6–4–1–3 allowed the exemption if the Estate could show that more than a merely nominal part of the transfer, either property or income, will be used in Indiana for religious, educational or charitable purposes. This can be shown *either* by specific provision of the transfers (not present here) or by past practices of the donees. Thus, in this case, the trial court must necessarily have had to rely on the past practices of the donees for lack of other guidance.

■ We interpret "past practices" to require consideration of only those activities which occurred *before* death and transfer, the pivotal point for probate and inheritance tax proceedings. To interpret otherwise would open the door for donees to manipulate the use of funds and their for-profit status and would subject the assessment of inheritance taxes to the vagaries of post-mortem events, an illogical and absurd result the legislature surely did not intend. *See In re Marriage of Lopp,* (1978) 268 Ind. 690, 378 N.E.2d 414, *cert. denied* (1979) 439 U.S. 1116, 99 S.Ct. 1023, 59 L.Ed.2d 76, *Allen County Department of Public Welfare v. Ball Memorial Hospital Assoc., Inc.,* (1969) 253 Ind. 179, 252 N.E.2d 424.

Inasmuch as I.C. 6–4–1–3 allows the trial court a choice, we also deem it appropriate to view the donees' past practices of expending funds in relation to *income* rather

**2.** Revenue confines its argument to whether the foundations are exempt by reason of spending merely a nominal part of their income in Indiana for charitable or educational purposes. It does not argue the foundations are excluded from exemption under the statute on grounds that monies spent out-of-state are for the benefit of a particular locality or that any of the personnel associated with them derive pecuniary profit from their operation other than reasonable compensation.

than to total assets. The transfers to the foundations consisted mainly of shares of stock, units of voting trusts, and real estate so it is realistic to assume that the income therefrom, rather than the assets themselves, will be used for religious, educational, or charitable purposes. Thus, it was logical for the trial court to determine whether the foundations had used more than a merely nominal part of their income in Indiana in the past, rather than of their assets.

We must therefore proceed to examine the evidence pertaining to each foundation to determine its compliance with this statutory scheme, paying particular heed to the status of each foundation and to its compliance with the requirement that "more than a merely nominal part" of its income must have been used in the past for educational and charitable purposes in Indiana.

Revenue and the Estate stipulated that Liberty Fund and Thirty-Five Twenty were organized under Indiana law as corporations to promote charitable or educational purposes and were in good standing as such not-for-profit corporations. Therefore, it cannot be said that these two foundations do not comply with the basic requirement of I.C. 6–4–1–3(d) ("corporation . . . wherever incorporated or organized, formed for charitable, educational, or religious purposes"). As for The Winchester Foundation, a private Indiana trust, the probate court adopted the federal government's income tax determination that it is a charitable, religious, or educational organization within the provisions of the Internal Revenue Code, thereby concluding it fit within the parameters of the Indiana exemption statute.[3] This conclusion is not unreasonable inasmuch as this Court has itself drawn guidance from federal tax law in inheritance tax matters. Cf. *In re Estate of Cassner*, (1975) 163 Ind.App. 588, 325

N.E.2d 487. Therefore, all three foundations are in compliance with the statutory requirement that they be charitable or educational in nature.

The next requirement to be satisfied is whether these foundations spent their income in Indiana for charitable or educational purposes. The financial statements Revenue submitted exhibited two categories of expenditures which could have been considered to have been made for proper purposes: 1) "gifts and contributions" (all foundations) and 2) "education and research" (Liberty Fund only). The parties stipulated that "[g]ifts and contributions made by the Foundations as shown in the summary . . . were made to charitable or educational institutions within the State of Indiana as shown in the summary." (Tr. p. 1055) Therefore, any dispute over the character of expenditures is focused on "education and research" in the Liberty Fund.

An examination of the evidence before the trial court reveals Liberty Fund is primarily devoted to the promotion of human liberty. To this end, funds expended on education and research go to subsidize seminars and research projects aimed at advancing the goals of the foundation, combating the precepts of statism and advancing the ideal of individual liberty free from governmental coercion and intimidation. These expenditures thus include payment for costs associated with these projects including lodging and honorariums for speakers, travel expenses for researchers, and publication expenses. The authorities indicate that these expenditures fell within the broad definition of "educational."

"Educational corporations or institutions are expressly exempted by some statutes from the inheritance tax. When such is the case, the meaning of the term 'educational' is at once brought in issue. The courts have been disposed to construe

---

**3.** This Court has noted that the record contains an uncertified copy of the Internal Revenue Service's original determination which described the functions of The Winchester Foundation. However, this document was never entered as evidence and could not be considered by the trial court. The trial court made its determina-

tion based upon a certified statement that the original letter had been lost but that its issuance in 1946 and continued validity justified the conclusion that the trust remained a charitable, educational or religious organization in the eyes of the federal government.

the word in its broad sense. It 'is not used in its meaning of instruction by school, college or university, which is a narrower and more limited meaning of the word, but in its broader signification as the act of developing and cultivating the various physical, intellectual, and moral faculties toward the improvement of the body, the mind, and the heart.' Hence a public library, art gallery, museum and library of art, the Young Men's Christian Association, the Young Women's Christian Association, and the Women's Temperance Union, have been regarded as educational institutions entitled to exemption." (Footnotes omitted.)

P. Ross, Inheritance Taxation § 148 (1912). In an analogous situation involving property tax exemptions our courts have held "the words 'educational, literary, scientific, religious or charitable purposes' ... are to be defined and understood in their broad constitutional sense." *Indianapolis Elks Building Corp. v. State Board of Tax Commissioners*, (1969) 145 Ind.App. 522, 532, 251 N.E.2d 673, 679 (property tax assessed against fraternal organization); *State Board of Tax Commissioners v. Professional Photographers of America, Inc.*, (1971) 148 Ind.App. 601, 268 N.E.2d 617 (no property tax against non-profit photography school). The regulations of the Internal Revenue Code are also instructive:

> "The term 'educational,' as used in section 501(c)(3), relates to—
> (a) the instruction or training of the individual for the purpose of improving or developing his capabilities; or
> (b) The instruction of the public on subjects useful to the individual and beneficial to the community.
> An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion...."

Treas. Reg. § 1.501(c)(3)–1(d)(3)(i) (1959). Example (2). An organization whose activities consist of presenting public discussion groups, forums, panels, lectures, or other similar programs."

Treas. Reg. § 1.501(c)(3)–1(d)(3)(ii) (1959). The Liberty Fund's education and research activities easily qualify under the purview of the law as exempt activities, especially when it is remembered that the foundation was already qualified for income tax exemption under § 501(c) and the foregoing regulations. As for tangential payments such as lodgings for speakers and researchers and publication costs, this Court has stated, again in the property tax context, that

> "while the test of the exemption is the use made of the property, the permissible uses must necessarily embrace all which are proper and appropriate, to effect the objects of the institution, so that a use incident to the main purpose for which the property is held is not [fatal to the exemption]."

*Indiana State Board of Tax Commissioners v. International Business College, Inc.*, (1969) 145 Ind.App., 353, 251 N.E.2d 39, 44–45 (exemption for dormitory properties). Thus, we conclude funds spent by the foundations for education and research by the Liberty Fund, as well as for gifts and contributions, to be within the statutory exemption.

The remaining issue is whether the foundations spent "more than a merely nominal part" of their income for these purposes. In construing the meaning of this phrase, we first rely upon one of the basic rules of statutory construction: "Words and phrases shall be taken in their plain, or ordinary and usual sense. But technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import." Ind.Code 1–1–4–1(1). We are also cognizant of the fact that Indiana courts liberally construe words of exemption in inheritance tax statutes in favor of the taxpayer and against the taxing authority. *Indiana Department of Revenue, Inheritance Tax Division v. Alexander's Estate*, (1953) 232 Ind. 661, 115 N.E.2d 747; *Indiana Department of State Revenue, Inheritance Tax Division v. Es-*

tate of Puett, (1982) Ind.App., 435 N.E.2d 298, transfer pending; Indiana Department of State Revenue, Inheritance Tax Division v. Estate of Martindale, (1981) Ind.App., 423 N.E.2d 662, Indiana Department of State Revenue, Inheritance Tax Division v. Lees, (1980) Ind.App., 418 N.E.2d 226; In re Estate of Cassner, (1975) 163 Ind.App. 588, 325 N.E.2d 487. Thus, "nominal" must be defined in its plain meaning and as liberally in favor of the taxpayer as possible without making the legislative intent of absolutely no effect.

This Court adopts the following definition of "nominal" in its plain and ordinary sense, as it relates to this particular statute, I.C. 6–4–1–3:

> "Titular; existing in name only, not real or substantial; ... not real or actual; merely named, stated, or given without reference to actual conditions, often with the implication that the thing named is so small, slight, or the like, in comparison to what might properly be expected, as scarcely to be entitled to the name...."

Black's Law Dictionary 1199 (Rev. 4th ed. 1968). In addition, we must consider the effect that the adverb "merely" is to have on the term "nominal," "merely" being defined as "[w]ithout including anything else; purely; only; solely; absolute; wholly." Black's Law Dictionary at 1139. Both "merely" and "nominal" are words of the same ilk, almost redundant, leading this Court to believe the legislature fully intended to emphasize the insubstantiality of the threshold requirement of the exemption. The legislature did not intend that a mere token expenditure could avoid taxation.

We thus do not resort to analogous definitions of "nominal damages." The law requires a *meaningful* expenditure in Indiana, "more than a merely nominal part." Charitable, religious and educational organizations relieve a state's burden to the extent that state funds do not have to be spent. Tax exemptions are provided in order not to diminish such benevolence. In cases such as here, where the foundations exist in order to espouse universal doctrines, the state obviously seeks to advance rather than hinder organizations which, in the long run, will benefit Indiana citizens both directly with more than nominal contributions and indirectly by benefitting mankind on a universal scale. *Cf. People v. First National Bank of Chicago,* (1936) 364 Ill. 262, 4 N.E.2d 378 (exemption granted to farm foundation which could expend funds out-of-state).

■ Here, the probate court properly exempted two of the foundations but was incorrect as to the third. The Liberty Fund utilized more than ten percent of its income for proper purposes in Indiana before Goodrich died, and The Winchester Foundation, more than thirty percent. We find these were substantial amounts of their respective incomes and not so small or slight as to be merely nominal parts thereof. Transfers to these foundations were tax exempt.

■ The situation with respect to Thirty-Five Twenty was otherwise. This foundation spent less than one-half of one percent of its income for proper purposes in Indiana before Goodrich died. Its total gifts and contributions during that period were $500, compared to an income of $127,660.[4] This

---

4. During that same time of relative dormancy in Indiana, Thirty-Five Twenty had general and administrative expenses in this state totaling $41,682, 33% of the income. Revenue contends that such expenditures were improperly considered by the probate court in determining the exemptions for all three foundations. This is not a problem with reference to Liberty Fund and The Winchester Foundation because the amounts spent for proper purposes (gifts, contributions, education and research) were substantial. However, with Thirty-Five Twenty general and administrative expenses may have influenced the trial court.

While there is some merit to the Estate's argument that general and administrative expenses made in Indiana, or a portion thereof, should be considered, especially with regard to providing employment to Indiana citizens, see *Fort Wayne Commandery No. 4, Knights Templar v. Bracken,* (1924) 82 Ind.App. 227, 145 N.E. 589 (held, organization was operated solely for religious, charitable or educational purposes although 5% of its proceeds was used to increase its membership and extend its influence), nonetheless, I.C. 6–4–1–3 required a consideration only of expenditures made for charitable, religious or educational purposes. Gen-

data falls squarely within our definition of nominal as being so small or slight in comparison to income as to scarcely be entitled to be called expenditures of any suit. The transfer made to Thirty-Five Twenty should be assessed for taxation.

We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

YOUNG, P. J., and CONOVER, J., concur.

eral and administrative expenses were not such purposes within the language of this statute.